**SOUTHERN PACIFIC TRANSPORTATION COMPANY, et al., Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al., Defendants.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff,**

v.

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, et al., Defendants.**

**Bankruptcy Nos. 90–4178–R, 90–4186–R.**

United States District Court, D. Kansas.

Nov. 13, 1990.

Amending order, —— F.Supp. ——.

Stephen D. Bonney, Jolley, Walsh & Hager, P.C., Kansas City, Mo., John O'B Clarke, Jr., Richard S. Edelman, David J. Strom, Highsaw, Mahoney & Clarke, P.C., Washington, D.C., for Intern. Broth. of Locomotive Engineers.

Connie R. DeArmond, U.S. Attorney's Office, Topeka, Kan., Clyde J. Hart, Jr., I.C.C., Washington, D.C., for I.C.C.

Mark L. Bennett, Jr., Bennett, Dillon & Callahan, Topeka, Kan., Robert S. Bogason, Southern Pacific Transp. Co., San Francisco, Cal., Dennis Arouca, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., Thomas J. Knapp, Lawrence M. Stroik, Burlington Northern R. Co., Fort Worth, Tex., for defendants and counter-claimant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This court is once again confronted with the battle between certain railroads and a union representing locomotive engineers over the operation of trains between Kansas City and Chicago pursuant to a trackage rights agreement. The railroads involved are the Southern Pacific Transportation Company; St. Louis Southwestern Railway Company; Denver & Rio Grande Western Railroad Company; and SPCSL Corporation (collectively referred to as "the railroads"). The railroads are rail carriers under the Railway Labor Act (RLA) and Interstate Commerce Act (ICA), engaged in the transportation of freight in intrastate, interstate and foreign commerce. The involved union is the International Brotherhood of Locomotive Engineers (BLE). The BLE represents certain of the railroads'

employees working throughout the railroads' systems.

This matter is presently before the court upon the following motions: (1) BLE's motion for order holding SPCSL in contempt of the court's order of October 25, 1990, or, alternatively, for modification of the October 25th order; (2) BLE's motion to amend preliminary injunction order so as to provide for posting of nominal bond; (3) railroads' motion for temporary restraining order and preliminary injunction; and (4) railroads' motion to stay order of October 25. On November 5, 6 and 7, 1990, the court held a hearing on these motions. During the hearing, the Interstate Commerce Commission filed a motion to intervene in this action. The court orally granted that motion. The court shall provide some additional background as we consider the various issues, arguments and evidence related to the pending motions. This memorandum and order shall constitute the court's findings of fact and conclusions of law.

The court's initial discussion shall focus on the railroads' motion for TRO and preliminary injunction and the BLE's motion for contempt. In order to begin the discussion of these motions, the court shall first set forth some factual background. These facts will include facts demonstrated at the prior hearing.

In 1987, the Chicago, Missouri & Western Railroad Company (CMW) purchased the railroad line from Chicago, Illinois to St. Louis, Missouri. The CMW also operated a line from Kansas City, Kansas to Springfield, Illinois. BLE entered into a collective bargaining agreement with the CMW to provide engineers for these lines. The CMW subsequently went into bankruptcy. SPCSL purchased certain rail assets of the CMW, including the Chicago to St. Louis line, from the bankruptcy court. On January 22, 1990, SPCSL and the BLE entered into an agreement to adopt the existing collective bargaining agreement between the CMW and the BLE. The agreement provided that the existing collective bargaining agreement would be applied to the SPCSL "except as provided for on Attachment B". Attachment B contained several amendments and supplements to the collective bargaining agreement. On October 4, 1990, SPCSL and the BLE agreed to some additional supplements and amendments to Attachment B.

In 1990, SPCSL and the other railroads entered into a trackage rights agreement with the Burlington Northern Railroad Company and the Norfolk & Western Railway Company. This agreement allows the railroads in this litigation use of the tracks between Kansas City, Missouri and Chicago, Illinois. The trackage rights agreement among the parties provides that only one of the railroads may operate over the tracks at a given time. Prior to acquisition of the trackage rights, the railroads here had never operated on the Kansas City to Chicago line. SPCSL was provided with initial use of the tracks.

As required by statute, SPCSL sought authorization from the Interstate Commerce Commission (ICC) to implement the trackage rights agreement. The trackage rights agreement fell within reach of the ICC's expedited procedure for receiving approval of certain rail transactions. In early September 1990, the SPCSL sought a waiver from the BLE of the twenty-day notice requirement set forth in the labor protective conditions required under transactions controlled by the Interstate Commerce Act (ICA). SPCSL sought the waiver in order to proceed immediately under the trackage rights agreement. Jim McCoy, General Chairman of the BLE, responded by letter on September 6, 1990 and refused to agree to such a waiver. Mr. McCoy indicated that he understood that the ICC had not granted the SPCSL the trackage rights over the Kansas City to Chicago line, and the BLE would be "vehemently opposed to the granting of these trackage rights." Mr. McCoy further stated the following:

In the event SPCSL acquires the trackage rights over Burlington Northern and Norfolk Southern Railroads between Kansas City, MO and Chicago, IL at a later date, it will be this General Committee of Adjustment's position that the present SPCSL Operating Agreements must be updated to be comparable to the

National Schedule Operating Agreements, so that Engineers on the SPCSL will be paid no less than Engineers on any Class 1 railroad.

The trackage rights agreement was subsequently approved by the ICC. On September 27, 1990, Mr. McCoy served a Section 6 notice under the Railway Labor Act (RLA) upon C.R. Huntington, Director of Labor Relations for the SPCSL. The notice was an indication that the BLE believed that the trackage rights agreement entered into by the SPCSL constituted a unilateral change in the collective bargaining agreement between the parties. The Section 6 notice requested bargaining over the assignment of work among the employees of the BLE and the railroads who were parties to the trackage rights agreement. Mr. Huntington responded that bargaining under the RLA was not required. He stated that the preemptive jurisdiction of the ICC precluded mandatory bargaining under the RLA. He did indicate that the railroad was willing to negotiate an implementing agreement concerning the mandatory labor protective conditions required in exemption cases under the ICA.

On October 17, 1990, Mr. McCoy wrote Mr. Huntington to again suggest negotiations under Section 6 of the RLA. In support of his request, he stated:

> That this new service will involve new rules and working conditions is obvious because the implementation of the Kansas City—Chicago service will involve establishment of a new home terminal at Quincy, IL and away terminals in Kansas City and Chicago. The establishment of such new terminals is clearly subject to collective bargaining under our Section 6 Notice and the RLA. Lest there be any misunderstanding on this point, please be advised that in negotiations concerning this Committee's Section 6 Notice, this Committee will seek to negotiate with regard to the establishment of these new terminals. Once again we reiterate that the unilateral establishment of such terminals would violate Section 6 of the RLA.

The BLE then indicated that its members would strike if the railroads proceeded to implement the trackage rights agreements as proposed. Subsequently, after both the railroads and the BLE had filed actions in this court, the court held a hearing on the railroads' motion for a temporary restraining order. The railroads sought to enjoin the BLE from engaging in the threatened strike. The court converted the railroads' motion to one for preliminary injunction and denied the railroads' motion. The court found that the SPCSL's establishment of a new terminal at Quincy, Illinois constituted a major dispute under the RLA which required the imposition of a status quo injunction against such action. Accordingly, we enjoined the SPCSL from establishing new rules and working conditions, including new terminals or extra boards, in connection with the trackage rights operation on the Kansas City to Chicago line until the major dispute procedures of the RLA have been exhausted.

The railroads immediately appealed this court's order. The subsequent proceedings in the Tenth Circuit are not immediately relevant to the issues contained in the BLE's motion for contempt and the railroads' motion for TRO and preliminary injunction. The court shall not discuss those proceedings at this point in this opinion.

On October 31, 1990, the railroads filed a "Notice of Intent to Implement" in this court. In this notice, the railroads advised the BLE and the court that the SPCSL intended to implement the trackage rights operation, but in a manner different than that originally planned. SPCSL decided that, rather than establishing a new terminal on the Burlington Northern's tracks, it would assign SPCSL engineers by calling them from extra boards identified in the collective bargaining agreement and then "deadheading" (transporting while in pay status) them to the Kansas City to Chicago line where they would operate the trains either to Chicago or to Kansas City.

BLE responded with the instant motion for contempt and with a threat to strike if the SPCSL began operation pursuant to the trackage rights agreement. SPCSL filed a

response to the BLE's motion and the instant motion for TRO and preliminary injunction. In its motion for contempt, BLE argues that the operation currently planned by SPCSL is so similar to that which gave rise to the dispute which is the subject of the court's order, and that the establishment of the currently planned service is so plainly within the proscription set forth in the order of October 25, that the court should find that the SPCSL's implementation of the new service would constitute civil contempt of the court's order. Alternatively, BLE requests that the October 25 order be modified so as to remove any ambiguity as to whether SPCSL may unilaterally implement such service while the processes of § 6 of the RLA are pending.

In its response and motion for TRO and preliminary injunction, the railroads argue that its action will not violate the court's order because it will not involve the establishment of a new terminal since engineers for the trackage rights operation will be called from extra boards as set forth in the collective bargaining agreement, and since the away-from-home terminals will be Chicago, which "is already an away-from-home terminal," and Kansas City, Kansas, pursuant to an asserted established practice permitting unilateral railroad establishment of away-from-home terminals, as well as a provision in the collective bargaining agreement. The railroads have also argued that the SPCSL cannot be held in contempt of the court's order because the BLE's motion is premature and the court's order was not an enforceable injunction. The railroads further seek a TRO and preliminary injunction enjoining the BLE from a threatened strike over the new proposed operation of the Kansas City to Chicago line because the BLE's threatened strike arises from a minor dispute under the RLA. Alternatively, the railroads seek an injunction because the dispute is a representation dispute to be resolved by the National Mediation Board.

Several issues are raised in the motions filed by the railroads and the BLE, but the following are the most important. First, does the order of October 25, 1990 preclude the proposed operation of the Kansas City to Chicago line? Second, if not, should the court's order be modified to include the actions undertaken by the railroad in the proposed plan? Finally, does the present dispute concerning the proposed operation constitute a major or minor dispute under the RLA? These questions are interrelated and will require the court to examine in some detail the court's prior order, the proposed operation, and the evidence concerning the impact of the existing collective bargaining agreement.

We begin by discussing in more detail the nature and background of the court's order of October 25. The court found that the establishment of a new terminal at Quincy, Illinois constituted a major dispute under the RLA which required the imposition of a status quo injunction against such action. In reaching this conclusion, we noted that the collective bargaining agreement was silent as to trackage rights agreements and any attendant changes. We further noted that the BLE had on previous occasions allowed the CMW to enter into trackage rights agreements without objection, but that none of these prior agreements had required the establishment of a new terminal. The court determined that the establishment of the new terminal in Quincy constituted a change in the existing contractual or legal obligation and relations among the parties due to the absence of support for such a change in the collective bargaining agreement or the past practice, usage and custom between the parties. Accordingly, we enjoined the SPCSL from establishing new rules and working conditions, including new terminal or extra boards, in connection with the trackage rights operation on the Kansas City to Chicago line until the major dispute procedures of the RLA have been exhausted.

We must next examine in some detail the proposed revised operation. SPCSL plans to use engineers off the "extra board" to operate the trains between Kansas City and Chicago. The "extra board" constitutes the group of engineers utilized for all jobs other than regular assignments. SPCSL will require extra board engineers

to report to work at Bloomington, Illinois. The Bloomington extra board is identified in the collective bargaining agreement and has been used by the CMW and SPCSL since 1987. The extra board engineers will be "deadheaded" to either Kansas City, Bushnell or Chicago to begin operation of the trains on the Chicago to Kansas City line. Engineers reporting for duty to Bloomington will begin being paid upon arrival. They will further be paid while deadheading pursuant to the pay provisions set forth in Attachment B. The extra board engineers will operate westbound trains from Chicago to Bushnell after being rested in Chicago. The engineers will be changed at Bushnell. The engineers that worked out of Chicago will be transported back to Bloomington where they will go off duty. The engineers picking up the train at Bushnell will work the train into Kansas City, be rested, and make a return trip to Bushnell. The assignments involved with this new service will not have defined starting times, but rather engineers will be called as trains are assembled in Kansas City or Chicago.

■ With this background, we shall proceed to the BLE's motion for contempt. The BLE contends that the proposed plan violates both the letter and the spirit of the court's order of October 25. The BLE recognizes that the focus of the prior order was the establishment of the new terminal at Quincy. Nevertheless, the BLE argues that the court's order reached beyond the establishment of new terminals and extra boards since it barred the establishment of new rules and working conditions.

■ This court has broad discretion in using its contempt powers to require adherence to court orders. *Universal Motor Oils Co., Inc. v. Amoco Oil Co.*, 743 F.Supp. 1484, 1486 (D.Kan.1990). The proof of contempt must be clear and convincing. *Id.*

The following passage from the court's order of October 25 properly summarizes its intent and scope:

> The railroad seeks to implement a trackage rights agreement which requires the establishment of a new terminal at Quin-

cy, Illinois. The collective bargaining agreement is silent as to the establishment of new terminals. The evidence has failed to indicate that the BLE has allowed the establishment of new terminals without their approval. Accordingly, the SPCSL has failed to establish that its right to establish new terminals has taken form and effect as an implied right. The establishment of a new terminal or extra board at Quincy involves a change in the existing contractual or legal obligations and relations among the parties. The court must conclude that the SPCSL's contractual justifications for its actions are obviously insubstantial. The dispute here between the BLE and the SPCSL regarding the establishment of a new terminal on the line operated pursuant to the trackage rights agreement is a major dispute subject to the mandatory bargaining provisions and status quo provisions of the RLA.

The court intended to limit the scope of the order to a consideration of the implementation of the trackage rights agreement as it required the establishment of the new terminal at Quincy. In this regard, we wish to clarify some other language contained in the opinion. Prior to the aforementioned passage, the court stated: "The collective bargaining agreement is silent as to trackage rights agreements and attendant changes. The provisions in the collective bargaining agreement cited by the SPCSL do not arguably justify the SPCSL's position that the agreement expressly provides for the implementation of trackage rights agreements." This language must be considered in the context of the original plan of operation proposed by the SPCSL. Contrary to the argument of the BLE, the court did not determine that the SPCSL's operation pursuant to the trackage rights agreement would be per se inconsistent with or constitute a change in the present collective bargaining agreement. The court did not intend to indicate that the collective bargaining agreement was devoid of any reference to trackage rights agreements. The court meant only that the collective bargaining agreement contained no

explicit references to the impact or implementation of trackage rights agreements. The court was aware that the agreement did contain some references to trackage rights agreements. For instance, in Rule 35 of the agreement, the parties provided that non-craft employees would not be allowed to operate trains on "trackage owned, operated and/or *leased* by the Chicago, Missouri & Western Railway." This reference indicates that the parties apparently contemplated that the SPCSL would lease and had leased other trackage through trackage rights agreements. In addition, the court determined that the past practices of the CMW, SPCSL and BLE supported an implied term of the collective bargaining agreement allowing the SPCSL to enter into trackage rights agreements. Specifically, the court noted that the CMW had entered into trackage rights agreements with other railroads without any objection by the BLE. The court further found that the SPCSL was still operating over the tracks involved in some of these agreements. In sum, the court's prior order was limited to enjoining the SPCSL implementation of the trackage rights agreement as it required the establishment of a new terminal in Quincy.

The court does not find that the revised plan is the functional equivalent of the establishment of a new terminal. The revised plan is decidedly different from the old plan and does not provide for the establishment of a new terminal. Under the revised plan, the engineers will report to an extra board specifically set forth in the collective bargaining agreement. This practice is significantly different than the original plan of operation. Accordingly, we are unable to find that the revised plan constitutes a violation of the court's prior order. Moreover, the court is unwilling to modify the previous injunction as requested by the BLE. The question as to whether the revised plan constitutes a change in working rules and conditions shall be addressed in our consideration of the railroads' motion for TRO and preliminary injunction.

The position of the railroads is that the present dispute over the operation of the revised plan constitutes a minor dispute under the RLA. The railroads argue that therefore they are entitled to an injunction against any strike in order to allow the National Railroad Adjustment Board to exercise jurisdiction over the dispute. Alternatively, the railroads contend that the dispute is a representational dispute which calls for an injunction to preserve the jurisdiction of the National Mediation Board.

■ The court, in our order of October 25, set forth the law applicable to disputes arising under the RLA. We shall provide only a brief summary in this opinion. Labor disputes arising under the RLA fall into two categories: "major disputes" and "minor disputes." Major disputes are disputes over new or changed rates of pay, rules, or working conditions. *Elgin, Joliet, and Elgin Railway Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945). They typically involve the formation or alteration of agreements and deal with prospective acquisition of rights. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, ——, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250, 261 (1989) (*Conrail*). By contrast, minor disputes presuppose the existence of an agreement about the disputed issue. They involve the interpretation or application of existing collective bargaining agreements and thus deal with rights previously accrued. *Id.* 491 U.S. at —— ——, 109 S.Ct. at 2480–81, 105 L.Ed.2d at 261–62. In *Conrail*, the Supreme Court further articulated the standard for differentiating between major and minor disputes as follows:

[T]he formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic selfhelp. Rather, the line drawn in [*Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)] looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of such a case is that the dispute may be

conclusively resolved by interpreting the existing agreement.

491 U.S. at ——, 109 S.Ct. at 2481, 105 L.Ed.2d at 263 (citations omitted).

In view of the substantial interest in removing labor disputes from the federal courts and placing them in the hands of expert arbitrators, the courts have weighted the scales in favor of finding that a controversy is a minor dispute. Nevertheless, an employer may not remove a dispute from federal court simply by framing its argument in a manner that creates ambiguity in contractual language where there is none. In *Conrail*, the Supreme Court approved this formulation of the test and summarized it as follows: "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." 491 U.S. at ——, 109 S.Ct. at 2482, 105 L.Ed.2d at 264.

 In defending an operational change as not raising a major dispute, a railroad is not limited to the collective bargaining agreement to show the basis for its action. The railroad can rely on parties' past "practice, usage and custom." *Conrail*, 491 U.S. at ——, 109 S.Ct. at 2485, 105 L.Ed.2d at 267. A minor dispute is present when the railroad can identify instances of past practice accepted by the unions which, arguably, support its contention.

 SPCSL seeks to rely on the collective bargaining agreement, the parties' past practices, and the custom and practice in the railroad industry in support of its position that the dispute over the revised plan is a minor dispute. SPCSL first argues that Rules 1, 21, 25 and 35 of the collective bargaining agreement collectively support its position. SPCSL further points out that the past practices of the parties provide support for the position that the revised operation does not constitute a change in working rules or conditions. Finally, SPCSL suggests that past practices in the railroad industry support

its argument. The BLE charges that the changes imposed by the revised operation raise a major dispute, because they constitute a unilateral action by the railroad not based on the existing agreement or past practice, thus constituting a question as to the formation of a new agreement. BLE has asserted that the SPCSL's implementation of its new plan of operation would establish the following new working conditions: (1) assignment of engineers to work off the SPCSL line in engine service unrelated to existing SPCSL operations; (2) deadheading of engineers off the SPCSL line to perform work unrelated to operation of that line; (3) establishment of previously unauthorized unassigned service; (4) use of extra board employees in a manner not authorized by existing written agreements or past practice. BLE further argues that the SPCSL's reliance upon industry custom is improper and inapplicable.

Having carefully examined the evidence presented at the most recent hearing, the court makes the following additional findings of fact:

1. From 1987 to the present, CMW and SPCSL have operated continuously over tracks of other railroads pursuant to trackage rights agreements. All of these tracks were physically connected to the present Chicago to St. Louis line. The tracks involved in the trackage rights agreement at issue in this case will also physically connect with the tracks on trackage rights involved in the Chicago area on the SPCSL's Chicago to St. Louis line.

2. SPCSL and CMW have in the past deadheaded employees various distances on or along their lines. CMW and SPCSL have in the past deadheaded employees off their lines in connection with train movements onto or off their lines.

3. The use of the extra board for the operation of extra trains has often occurred. These extra trains have on several occasions been operated on a regular, recurring basis.

4. Rule 21(a) of the collective bargaining agreement provides for three classes of freight service: (1) terminal freight service,

(2) road freight service, and (3) express freight service. It requires that the railroads issue bulletins describing the starting point, starting time and rest days for these assignments. These assignments are referred to as "regular assignments."

5. Rule 21(d) provides that "the Carrier shall not abolish or annul regular assignments and operate extra assignments in lieu thereof." Rule 21(e) states: "All extra freight assignments shall be made from the extra boards provided for by Rule 31. Extra assignments may be made in any class of service, at any time, at the sole discretion of the Carrier."

6. The revised plan of operation will not result in the abolishment of any regular assignments.

7. Attachment B to the collective bargaining agreement allows railroads to use "pool service" on the St. Louis to Chicago line. "Pool service" is generally regarded as regular service without a starting time.

8. Any delay in the operation of trains on the Kansas City to Chicago line will result in substantial financial losses to the railroads. The use of the Kansas City to Chicago tracks will allow the railroads to provide "single line" service (service without interchange with another railroad) to their customers. This will provide an opportunity for the acquisition of additional business. The railroads' only other method of providing single line service (by providing service to Chicago through St. Louis) is too circuitous and unattractive to shippers.

9. The operation of the Kansas City to Chicago line by the railroads will result in additional work and additional jobs for the BLE engineers.

With these facts, we turn to an application of the existing law. The court has carefully examined the collective bargaining agreement and the past practices of the parties. Based upon this examination, we must conclude that the SPCSL's revised operation constitutes a minor dispute under the RLA. We do not find that the revised operation constitutes a change in the rates of pay, rules, or working conditions that are currently a part of the existing collective bargaining agreement. Rather, we

find that the dispute over the revised operation involves disagreements over the interpretation or application of the specific provisions within the existing agreement. The position taken by the railroad concerning the revised operation is arguably justifiable under the collective bargaining agreement and the past practices of the parties. We have reached this conclusion based on language in the collective bargaining agreement which appears to support the SPCSL's position and the evidence presented concerning the past practices of the parties on "trackage rights," "extra boards" and "deadheading." We shall not resolve the dispute, but only note that the position of the railroad is not obviously insubstantial.

█ Finally, we want to address the BLE's contention that the filing of the § 6 notice requires the status quo to be maintained, including the prevention of the operation of the Kansas City to Chicago line based on the trackage rights agreement. Regarding this contention, we must turn to the recent opinion written by Judge Posner of the Seventh Circuit. In *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n*, 908 F.2d 144, 151–52 (7th Cir.1990), Judge Posner addressed a similar argument as follows:

Section 6 itself states that whether the carrier or the union files the notice, the carrier may not alter the status quo until the section 6 procedures are exhausted— provided that the notice makes a demand that the carrier is required to bargain over. A union cannot freeze the status quo by demanding negotiations over something that the carrier is entitled to do unilaterally either because the collective bargaining agreement authorizes the carrier to do it or because it is within the carrier's "management prerogatives," the class of decisions that are not decisions about rates of pay, rules, or working conditions and so are outside the scope of the status quo provision altogether. *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Association*, [491 U.S. ——, 109 S.Ct. 2584, 2595, 105 L.Ed.2d 415 (1989) ]. A demand for bar-

gaining that is outside that scope imposes no obligations on the carrier.

The two types of carrier's entitlement to act unilaterally—contractual and prerogative—are not sharply distinct, if indeed they are distinct at all. A matter of prerogative is one the carrier is not required to bargain over and therefore is unlikely to surrender in bargaining, though nothing in the Act forbids it to do so. *Order of Railroad Telegraphers v. Chicago & North Western Ry.*, 362 U.S. 330, 337–40, 80 S.Ct. 761, 765–67, 4 L.Ed.2d 774 (1960). If there has been no waiver of prerogative in the collective bargaining agreement, then the union cannot insist that the carrier bargain over prerogative matters, such as executive perks, recapitalization, rates charged shippers, and other matters that are only indirectly—though often vitally—related to the status of the workers represented by the union. The union's insistence on bargaining over such matters confers no rights under section 6.

Here, the BLE cannot freeze the status quo over the revised operation because the SPCSL is arguably authorized to implement the trackage rights agreement as proposed. The present situation is not controlled by *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), as was the original plan of operation. In *Shore Line*, the Supreme Court found that the railroad's proposal to establish outlying work assignments away from the principal yard constituted a major dispute under the RLA. The Court found nothing in the collective bargaining assignments that allowed such assignments and no evidence of past work assignments away from the principal yard with the knowledge and acquiescence of the union. The instant situation is distinguishable from *Shore Line*. Under the revised plan of operation, the BLE's working conditions and rules are not changed. In sum, the revised operation presents a classic minor dispute. Having found the existence of a minor dispute, the court need not consider the railroads' arguments concerning the presence of a representation dispute.

We must next consider whether to grant the railroads' motion for TRO and preliminary injunction. First, the court shall consider the motion as one for a preliminary injunction since both sides had the opportunity to present evidence and arguments on the issues raised by the motion. 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2951, pp. 500–01 (1973). Second, the court finds that the railroads have met the necessary requirements for the imposition of a preliminary injunction. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). Accordingly, the court shall enjoin the BLE from striking over the implementation of the revised plan. The court shall require the railroads to post a bond in the amount of $15,000.00. The court believes this amount will provide adequate security. The court shall require the parties to take all steps necessary to obtain a speedy resolution of this dispute by the National Railroad Adjustment Board as quickly as possible.

■■■ The court shall now turn our attention to the BLE's motion for nominal bond. The BLE has properly pointed out that the court failed to require the posting of a bond or other security in its order of October 25. BLE contends that the court should require only a nominal bond. The railroads argue that the BLE should be required to post a bond in the amount of two million dollars.

■■■ The court has wide discretion in determining the amount of the bond under Fed.R.Civ.P. 65(c). *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964). Having carefully considered the circumstances in these cases, the court shall require the BLE to post a bond of $25,000.00. The court does not find that a bond as large as requested by the railroads is necessary because the railroads will now be allowed to operate pursuant to the trackage rights agreement. We recognize that the revised operation may be more costly, but we believe that the aforementioned amount is adequate to cover the costs and damages that may be incurred.

The last motion for consideration is the railroads' motion for a stay of the court's order of October 25. The court shall hold this motion in abeyance pending receipt of the ICC's brief in this matter. The court has allowed the ICC until November 14, 1990 in which to file its brief. The court shall allow the other parties until November 21, 1990 in which to respond to the arguments raised in the ICC's brief. At that time, the court shall consider the railroads' motion for stay.

IT IS THEREFORE ORDERED that BLE's motion for order holding SPCSL in contempt of the court's order of October 25, 1990, or, alternatively, for modification of the October 25th order be hereby denied.

IT IS FURTHER ORDERED that BLE's motion to amend the preliminary injunction so as to provide for posting of nominal bond be granted in part and denied in part. The court shall require the BLE to post a bond in the amount of $25,000.00.

IT IS FURTHER ORDERED that the railroads' motion to stay the order of October 25 be held in abeyance pending further briefs on the ICC's motion to intervene.

IT IS FURTHER ORDERED that the railroads' motion for preliminary injunction be hereby granted. The railroads shall post a bond in the amount of $15,000.00 as security for the injunction.

IT IS FURTHER ORDERED that the parties should take the necessary steps to submit this dispute to the National Railroad Adjustment Board within thirty days of the date of this order.

IT IS FURTHER ORDERED that the BLE, and its officers or members, individually and as representatives of all the members of the BLE employed by the railroads, and each of them, their agents, successors, deputies, servants and employees, and all persons acting by, with, through, under or in concert with them, or any of them, or by or through their order, are enjoined until further action of this court:

1. from threatening, calling, instigating, authorizing, encouraging, participating in, approving, or continuing any picketing, patrolling, strike, work stoppage, "sick-out," job action or slowdown against the railroads, rail operations and all acts in furtherance or in support thereof;

2. from threatening, calling, authorizing, encouraging, participating in, approving or continuing any strike, work stoppage, or other form of job action, intended to or having the consequence of (a) impeding implementation of transactions which are the subject of Interstate Commerce Commission Finance Dockets Nos. 31170 and 31731, including but not limited to operation of trains by SPCSL Corp. between Kansas City, Missouri and Chicago, Illinois, over the tracks of the Burlington Northern Railroad and Norfolk & Western Railroad; or (b) coercing the reopening, renegotiating, or otherwise compelling bargaining to change the collective bargaining agreements between SPCSL Corp. and BLE;

3. from picketing, patrolling, marching or demonstrating at or near the premises on which the railroads conduct their operations, including the entrances and exits thereto, and any other places where said premises are situated including but not limited to SPCSL Corp. facilities;

4. from interfering with ingress to or egress from said premises including the delivery, unloading, loading, dispatch and movement of any equipment and the contents thereto;

5. from loitering or congregating at or near any approaches to said premises and upon any public street or highway leading to and from any place which the employees of the railroads or those having business with the railroads desire to enter or leave en route to or from said premises.

IT IS FURTHER ORDERED that the BLE take all steps within its power to terminate, avert and prevent the strike.

IT IS SO ORDERED.