**SOUTHERN PACIFIC TRANSPORTATION COMPANY, et al., Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al., Defendants.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al., Plaintiffs,**

v.

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, et al., Defendants.**

**Nos. 90–4178–R, 90–4186–R.**

United States District Court, D. Kansas.

Jan. 11, 1991.

Mark L. Bennett, Jr., Bennett, Dillon & Callahan, Topeka, Kan., Dennis Arouca, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Robert S. Bogason, San Francisco, Cal., for plaintiffs.

Connie R. DeArmond, U.S. Atty's Office, Topeka, Kan., Clyde J. Hart, Jr., I.C.C., Washington, D.C., for I.C.C.

Stephen D. Bonney, Scott Raisher, Jolley, Walsh & Hager, P.C., Kansas City, Mo., John O'B. Clarke, Jr., Richard S. Edelman, David J. Strom, Highsaw, Mahoney & Clarke, P.C., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This matter is presently before the court upon consideration of arguments contained in a brief filed by intervenor Interstate Commerce Commission (ICC) and the following motions filed by the railroads: (1) motion for stay pending appeal of order of October 25, 1990 (Doc. # 28); (2) motion to vacate, alter or amend judgment of October 25 (Doc. # 52); and (3) motion to amend order of November 13, 1990 (Doc. # 54). The railroads have requested oral argument on these motions, but the court deems it unnecessary. Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

BACKGROUND

The court shall initially provide a very brief background. These cases arise out of a trackage rights agreement entered into by the railroads who are parties to this action. This agreement allowed the railroads to operate their trains between Kansas City and Chicago. The railroads sought and received an exemption from the ICC in order to allow them to begin operation over the new trackage immediately. SPCSL Corporation was provided with the initial use of the tracks. When SPCSL sought to implement operations under the trackage rights agreement, using a new terminal at Quincy, Illinois, the union parties threatened a strike. The railroads then filed Case No. 90–4178–R, seeking a declaratory judgment that the threatened strike by the union would be unlawful and an injunction against such a strike. The railroads subsequently moved for a preliminary injunction against the threatened strike. The union parties responded with the filing of Case No. 90–4186–S. In this action, the union sought a declaratory judgment that the implementation of the trackage rights agreement violated the Railway Labor Act (RLA).

After a hearing on October 18 and 19, this court entered an order on October 25, 1990 in which we: (1) consolidated these actions for all further proceedings; (2) denied the railroads' motion for a preliminary injunction; and (3) enjoined the "SPCSL ... from establishing new rules and working conditions, including new terminals or extra boards, in connection with the trackage rights operation on the Kansas City to Chicago line until the major dispute procedures of the RLA have been exhausted." The railroads immediately appealed this order.

On October 31, 1990, the railroads filed a "Notice of Intent to Implement" in this court. In this notice, the railroads advised the union and the court that the SPCSL intended to implement the trackage rights operation, but in a manner different than that originally planned. This prompted a motion for contempt and another threat to strike from the union. The railroads countered with another motion for preliminary injunction.

On November 5, 1990, the railroads filed the pending motion for stay pending appeal of the court's order of October 25. The railroads argued, *inter alia*, that injunctive order was deficient and ineffective due to the court's failure to address the bond requirement of Fed.R.Civ.P. 65(c) and the applicable standards for preliminary injunctive relief. The union subsequently responded with a motion to amend the court's order of October 25 to consider the imposition of a bond pursuant to Rule 65(c).

On November 5, 6 and 7, 1990, the court held a hearing to consider the pending motions. During that hearing, the court allowed the ICC to intervene in this action. On November 13, 1990, the court entered an order which: (1) denied the union's motion to hold SPCSL in contempt or to modify the October 25 order to prohibit such implementation; (2) partially granted the

union's motion to amend the October 25 order by requiring a $25,000 bond; (3) granted the railroads' motion for a preliminary injunction against a strike concerning implementation of the revised trackage rights operation; and (4) held in abeyance the railroads' motion for a stay of the October 25 order pending appeal until the court considered the ICC's brief and the parties' responses. 752 F.Supp. 400. The court also clarified that its prior order was intended only to prohibit implementation of the trackage rights agreement as it required a new terminal or new extra board.

In the meantime, the ICC issued an administrative order on November 9, 1990 disposing of the union's request that the ICC order SPCSL to negotiate with the union pursuant to the RLA prior to implementing the trackage rights agreement. The ICC rejected the union's request and stated that 49 U.S.C. § 11347 provided:

the "exclusive mechanism" for resolving labor disputes arising out of implementation of rail transactions approved by the Commission or exempted by the Commission from the approval process. *Brotherhood of Locomotive Engineers v. Boston and Maine Corp.*, 788 F.2d 794, *cert. denied*, 421 U.S. 975 [479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59] (1975 [1986]); *Brotherhood of Locomotive Engineers v. Chicago & North Western Ry.*, 314 F.2d 424 (8th Cir.1963), *cert. denied*, 375 U.S. 819 [84 S.Ct. 55, 11 L.Ed.2d 53] (1963). Both the provisions of 49 U.S.C. 11341 and 11347 protect this exclusivity. The former exempts transactions approved under 49 U.S.C. 11343 from the effect of other laws (including the RLA) to the extent necessary to carry out the transaction. The latter mandates the imposition of protective conditions which provide for implementing agreements that may supersede existing collective bargaining agreements as regards selection and assignment of forces issues.

Neither party may invoke the RLA or self help procedure since doing so would prevent the transaction from going forward.

## MOTION TO VACATE, ALTER OR AMEND JUDGMENT OF OCTOBER 25

The parties have disagreed on the Federal Rule of Civil Procedure applicable to this motion. The railroads argue that this motion should be considered under Fed.R. Civ.P. 59(e), while the union contends that the motion must be considered under Fed. R.Civ.P. 60(b).

The deadline for a Rule 59(e) motion is ten days from entry of a "judgment," which is defined in Rule 54(a) as "any order from which an appeal lies." The parties have reached differing conclusions as to whether the October 25 order was an appealable order. The railroads assert that the court's preliminary injunction order was not a final judgment because we failed to impose a bond requirement as required by Rule 65(c). The union contends that the order was enforceable and was a final judgment despite the absence of the bond.

 The court agrees with the position of the railroads on this issue. In the Tenth Circuit, contrary to the law in some of the other circuits, a district court's preliminary injunction order is not a final judgment from which an appeal can be taken unless the court considers the bond requirement of Rule 65(c). *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987). Accordingly, this court's order of October 25 was not a judgment under Rule 54(a) until we imposed a bond in our order of November 13. Therefore, the railroads' motion to vacate, alter or amend filed on November 21, 1990 was timely filed and shall be considered under Rule 59(e).[1]

---

1. The union has also suggested that this court is precluded from considering the railroads' Rule 59(e) motion because the railroads filed a notice of appeal from the October 25 order. The court also finds no merit to this argument. If a timely Rule 59(e) motion is filed, then any prior notice of appeal "shall have no effect." Fed.R. App. 4(a)(4). In such a case, "'[t]he appeal simply self-destructs.'" *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 61, 103 S.Ct.

400, 403–04, 74 L.Ed.2d 225 (1982) (quoting 9 J. Moore, B. Ward, & J. Lucas, Moore's Federal Practice ¶ 204.12[1], p. 4–65, n. 17 (1982)).

We also note that the railroads have asked primarily that the court's order of October 25 be vacated under Rule 59(e). Rule 59(e) has been interpreted as permitting a motion to vacate the judgment, rather than merely to alter or amend it. *Miller v. Leavenworth–Jefferson Electric Co-*

In its motion to vacate, alter or amend, the railroads raise two arguments. First, the railroads argue that the court should vacate its October 25 order because the ICC's authority under the Interstate Commerce Act (ICA) is exclusive and preempts the RLA. The ICC has made the same argument in its brief. The court shall consider the arguments of the ICC and the railroads in considering this motion. Second, the railroads contend that the October 25 order should be vacated because the union failed to satisfy the necessary requirements for the imposition of a preliminary injunction, including the demonstration of irreparable harm.

■ The court shall consider the latter argument first because it is easily resolved. The argument of the railroads on this issue is frivolous. In the order of October 25, the court, having found a major dispute under the RLA, imposed a status quo injunction. "The district courts have subject matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable harm." *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250, 261 (1989) (citing *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) and *Division No. 1, Detroit, Brotherhood of Locomotive Engineers v. Consolidated Rail Corp.*, 844 F.2d 1218 (6th Cir.1988)). Having found a major dispute under the RLA, this court did not need to consider the traditional requisites in equity for obtaining injunctive relief. Accordingly, this argument provides no basis to vacate the court's order of October 25.

We next turn to the arguments raised by ICC and the railroads that the ICA supersedes and displaces the RLA. The court has previously considered this argument and rejected it in the context of this case. The railroads and the ICC believe that the court erred in its previous decision.

In its brief, the ICC contends that it has exclusive and plenary jurisdiction over the trackage rights transaction in question and that the status quo injunction issued by the court pursuant to the RLA should be dissolved. This argument is based upon the application of the immunity provisions of 49 U.S.C. § 11341 and upon the application of the labor protective conditions required by 49 U.S.C. § 11347. The ICC suggests that the labor protective conditions displace the RLA dispute resolution procedures. The ICC argues that the Supreme Court's opinion in *Pittsburgh and Lake Erie Railroad Co. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (*PL & E*) provides additional support for its position in this case. Finally, the ICC asserts that the Norris–LaGuardia Act (NLGA) does not prevent the issuance of an injunction in support of its power to resolve labor disputes arising out of an exempted trackage rights transaction.

We begin with some background on the ICC's role concerning trackage rights agreements. Under the ICA, the ICC must regulate all trackage rights agreements. 49 U.S.C. § 11343(a)(6). The railroads may seek approval of a trackage rights agreement pursuant to 49 U.S.C. § 11344 or they may petition for exemption of the trackage rights agreement from the requirements of § 11344 pursuant to 49 U.S.C. § 10505.[2] A

*operative, Inc.*, 653 F.2d 1378, 1380 (10th Cir. 1981).

**2.** In the 1970's, the declining fortunes of the nation's rail industry came to a crucial focus when several major railroads collapsed. Congress realized that extensive regulation was prohibiting the railroads from becoming economically viable. Congress responded with the passage of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. Through these

Acts, Congress intended to liberalize the regulatory framework that the ICA imposed on the railroad industry. *Simmons v. ICC*, 697 F.2d 326, 328 (D.C.Cir.1982). The ICC was charged with responsibility for actively pursuing exemptions for transportation and services that would allow competition and would minimize the need for regulatory control over the rail industry. *Winter v. ICC*, 851 F.2d 1056, 1058–59 (1988). Following this Congressional mandate, the ICC adopted rules exempting certain trackage rights arrangements, as a class, from regulation under

trackage rights exemption allows a transaction between two railroads to be consummated seven days after the railroads file a notice with the ICC. 49 C.F.R. § 1180.4(g). The procedural mechanism for other interested parties to challenge exempt trackage rights agreements is a petition to revoke under 49 U.S.C. § 10505(d). *Id.* at § 1180.4(g)(2)(ii). The filing of such a petition does not stay the effectiveness of the exemption. *Id.*

The ICA requires that railroads impose certain labor conditions to protect the applicants' employees affected by either an exempted or approved transaction. 49 U.S.C. §§ 10505(g)(2), 11347; *McGinness v. ICC,* 662 F.2d 853, 859–60 (D.C.Cir.1981) (employee protective conditions of § 11347 apply to transactions exempted from approval by the ICC pursuant to § 10505, as well as to those for which a railroad seeks approval). The ICC has developed a series of labor protective conditions known as the Norfolk and Western Conditions or N & W Conditions for the protection of the affected employees in trackage rights transactions.[3] The Supreme Court has explained the N & W Conditions as follows: "These provide, *inter alia,* for 'the selection of forces from all employees involved' ... in transactions involving the dismissal or displacement of employees, and for retention of '[t]he rates of pay, rules, working conditions and all collective bargaining and other

rights, privileges and benefits ... unless changed by future collective bargaining agreements or applicable statutes.' " *ICC v. Brotherhood of Locomotive Engineers,* 482 U.S. 270, 274, 107 S.Ct. 2360, 2363, 96 L.Ed.2d 222 (1982) (citations omitted). The N & W Conditions protect employees adversely affected by a grant of trackage rights for up to six years. Under the N & W Conditions, either the railroad or the union may ultimately call for arbitration if the two sides fail to conclude what is commonly termed an "implementing agreement." Initially, the railroad must first give at least 20 days notice of its plans to acquire trackage rights over joint ownership in, or joint use of lines operated by another railroad. Either side may then call for negotiations, which may last no more than 20 days. If there is a failure to reach an implementing agreement at the end of the negotiation period, the parties must select a neutral referee, or, if they cannot even agree on that, ask the National Mediation Board to appoint one. The referee must hold a hearing, and thereafter issue a "final, binding, and conclusive" decision.

■■■ The parties have disagreed on whether the trackage rights transaction in this case was "approved" or "exempted." It is now quite clear to the court that the railroads' trackage rights agreement was exempted, not approved, by the ICC. Here, the railroads sought exemption of

---

49 U.S.C. § 11343. *Railroad Consolidation Procedures—Trackage Rights—Exemption–Ex Parte No. 282(Sub–No. 9),* 1 I.C.C.2d 270 (1985), *aff'd sub nom. Illinois Commerce Commission v. ICC,* 819 F.2d 311 (D.C.Cir.1987) (*Ex Parte 282* ). In *Ex Parte 282,* the ICC concluded that "regulation of this class of transactions is not necessary to promote the rail transportation policy" and that such transactions were "limited in scope" and did not involve "real potential" for abuse of market power. *Id.* at 276, 278–279. In addition, the ICC specifically rejected a request that the immunity from other laws provision of § 11341(a), specifically the reference to immunity from antitrust laws, be extended to transactions exempted from regulation under that order. The ICC stated:

Section 11341(a) reaches only transactions exempted "under this subchapter," that is, subchapter III of Chapter 113 of the Act. The exemption in this proceeding is under subchapter I of Chapter 105 of the Act. Accord-

ingly, Section 11341(a) does not apply to the transactions exempted in this proceeding.

Once a matter has been exempted, our regulatory role ceases unless relocation is sought under 49 U.S.C. § 10505(d). *See Exemption From Regulations—Boxcar Traffic,* 367 I.C.C. 746 (1983). Therefore, to file an application for approval and obtain antitrust immunity a carrier must have the class exemption revoked as to its particular transaction. *Id.* at 279.

**3.** The N & W Conditions derive from *Norfolk & Western Railway—Trackage Rights—Burlington Northern, Inc.,* 354 I.C.C. 605 (1978), *modified sub nom. Mendocino Coast Railway—Lease and Operate—California Western Railroad,* 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Executives' Ass'n v. United States,* 675 F.2d 1248 (D.C.Cir. 1982), as clarified in *Wilmington Terminal Railroad—Purchase and Lease—CSX Transportation,* 6 I.C.C.2d 700 (1990), *petition for review pending,* No. 90–3621 (6th Cir.1990).

the trackage rights agreement. The agreement was subsequently exempted on September 27, 1990. This means that the trackage rights agreement was exempted from approval by the ICC through the operation of an exemption under chapter 105 and was not approved by the ICC under chapter 113. With this issue behind us, we move to the other arguments of the parties.

This finding requires the rejection of one of the arguments made by the ICC and the railroads. The ICC and the railroads had argued that the language of 49 U.S.C. § 11341(a) suggested that the provisions of the RLA had no impact on a decision of the ICC. Section 11341(a) provides that "[t]he authority of the Interstate Commerce Commission under this subchapter is exclusive." It further provides as follows:

A carrier or corporation participating in or resulting from a transaction approved or exempted by the Commission under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without approval of a State authority. A carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.

49 U.S.C. § 11341(a).

The language of § 11341 indicates that it is inapplicable here because the railroads obtained their exemption under 49 U.S.C. § 10505 and did not obtain approval under 49 U.S.C. § 11344. Moreover, even if § 11341 were applicable here, we do not find that the railroads have demonstrated the necessity to override the RLA in order to implement the trackage rights operation. *See Burlington Northern Railroad Co. v. United Transportation Union*, 862 F.2d 1266, 1279–80 (7th Cir.1988).

The railroads next contend that the authorization by the ICC of a transaction subject to employee protection conditions supersedes the RLA. In this regard, the railroads contend that we should defer to the views expressed by the ICC, as intervenor and in their administrative decision of November 9, that the RLA requirements are superseded by an ICC order exempting a transaction from regulation. In addition, the railroads and the ICC rely upon the following cases for support: *Brotherhood of Locomotive Engineers v. Boston and Maine Corp.*, 788 F.2d 794 (1st Cir.1986), *cert. denied*, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986); *Burlington Northern Inc. v. American Railway Supervisors Ass'n*, 503 F.2d 58 (7th Cir.1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *Nemitz v. Norfolk and Western Railroad*, 436 F.2d 841 (6th Cir. 1941), *aff'd on other grounds*, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971); *Brotherhood of Locomotive Engineers v. Chicago & North Western Railway*, 314 F.2d 424 (8th Cir.1963), *cert. denied*, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963).

The railroads begin by arguing, based on *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), that this court should give great deference to the ICC's determination that the provisions of the ICA supersede the RLA. We cannot agree. In *Chevron*, the Supreme Court did hold that considerable weight should be given to an executive department's construction of a statutory scheme it is entrusted to administer. 467 U.S. at 844, 104 S.Ct. at 2782–83. However, the ICC's construction here impacts upon the viability of the RLA. "[T]he ICC has not been charged with the administration of the RLA, nor has it had occasion or power to rule on an RLA bargaining question." *Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie Railroad Co.*, 845 F.2d 420, 444 (3d Cir.1988), *vacated on other grounds sub nom. Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Ass'n, supra*. We do not believe that the ICC has the authority to decide this court's jurisdiction. Accordingly, we find deference inappropriate here.

Moreover, we are not persuaded by the remaining arguments offered by the railroads and the ICC. We note, as did the Supreme Court in *ICC v. BLE*, that the N & W Conditions provide for the preservation of the collective bargaining rights. Neither the railroads nor the ICC has pointed to any of the N & W Conditions which expressly or impliedly preclude RLA bargaining over new rates of pay, rules and working conditions, especially over matters unrelated to the assignment and selection of forces. In turning to the case authority cited by the railroads and the ICC, we note that three of the decisions cited for support are distinguishable. In *BN v. ARSA, Nemitz v. N & W*, and *BLE v. C & NW*, the courts considered transactions approved by the ICC under the predecessor to § 11343 so that the immunity afforded by the predecessor to § 11341(a) was applicable to those transactions. In addition, all of these cases involved implementing agreements which were entered voluntarily by the railroads and unions involved and which were adopted by the ICC as its protective arrangements. The courts were confronted with the issue of whether these agreements could be altered, challenged or enforced other than through ICA procedures. The courts held that once the unions entered agreements establishing the terms of the employee protective arrangements, and once the ICC adopted those arrangements, the unions could not negotiate different arrangements or enforce or challenge those arrangements outside the ICA mandated process. *BN v. ARSA*, 503 F.2d at 62–64; *Nemitz v. N & W*, 436 F.2d at 843–45; *BLE v. C & NW*, 314 F.2d at 426–27, 432–34. Accordingly, those decisions merely bound the unions to the agreements and the dispute resolution process they adopted voluntarily, and barred the unions from alteration of voluntarily adopted employee protective conditions once they were adopted by the ICC as its conditions for approval of the transactions. These decisions do not suggest that RLA bargaining is precluded over matters not related to the assignment and selection of forces and employee protective benefits issues.

In *BLE v. B & M*, the First Circuit held that compliance with the labor protective conditions accompanying an exemption of a trackage rights agreement relieves the railroads of their obligations under the status quo and mandatory bargaining provisions of the RLA. The court appeared to base its decision in part on the unchallenged assumption that exemptions under § 10505 of § 11343 transactions are automatically subject to the express preemptive language of § 11341. We are unwilling to follow this decision because we believe that the First Circuit incorrectly assumed that § 11341 was applicable. In addition, we believe that the instant case is distinguishable from it, even if we believed that the decision was correct. The issue raised by the union in *BLE v. BN* concerned the manning of trains, an assignment and selection of forces issue specifically within the reach of the N & W Conditions. In sum, we shall not follow the First Circuit.

In rejecting the cases cited by the railroads and the ICC, we believe that the district court's decision in *Burlington Northern Railroad Co. v. United Transportation Union*, 688 F.Supp. 1261 (N.D. Ill.1988), *vacated on other grounds*, 862 F.2d 1266 (7th Cir.1988) provides some support for this court's refusal to hold that the ICA supersedes the RLA in the context of this case. In *BN v. UTU*, the union sought a preliminary injunction to prevent the implementation of the BN's trackage rights agreement with a subsidiary, and the railroad sought injunctive relief to prevent the union from striking because of the agreement. The ICC had exempted the trackage rights transaction pursuant to 49 U.S.C. § 10505. The BN argued, *inter alia*, that the ICC exemption of the trackage rights agreement relieved the BN of its duty under the RLA. The union had served a § 6 notice under the RLA and contended that the trackage rights agreement constituted a unilateral change in working rules and conditions. The district judge rejected the BN's argument that the RLA must yield to the labor protective conditions imposed by the ICA. He stated:

[W]e conclude that the labor protective conditions accompanying the exemption

of a trackage rights agreement between a carrier and its wholly-owned financially-dependent subsidiary implicating substantial rail traffic do not relieve the carrier of its attendant obligations under the RLA. In those decisions in which the courts held that ICC-imposed labor protective conditions superseded the RLA, the courts were not faced with a carrier making an agreement essentially with itself and then, through the good offices of the ICC, circumventing the mandatory bargaining procedures of the RLA in order to operate trains over substantial portions of its tracks without abiding by the terms of its union contracts. Here, there is a very real danger that a carrier could, whenever it is unable to renegotiate its labor contracts to its satisfaction, force the unions to accede to its demands by shifting business (or funnelling new business) to a subsidiary in clear violation of the RLA, and then resorting to ICC exemption procedures to strip the unions of their protections under the RLA.

By the very terms of the Staggers Act, the benefits to the transportation policy of the ICA that accompany the exemption are minimal. Indeed, the benefits would accrue, for the most part, to Burlington in the form of unions in a much weaker bargaining position by virtue of the inapplicability of the RLA. The potential harm to the RLA and the whole concept of collective bargaining agreements is, in the context of this case, significant. There is no evidence that Congress intended that the important *but limited* aim of the ICC in assuring fair wages and working conditions as it promotes railway commerce would undermine the foundation of a federal labor statute that has stood the test of time, virtually untouched. The potential harm to the basic policies of the RLA far outweigh any benefits to commerce that might accompany an exempted trackage rights agreement between a carrier and its wholly-owned subsidiary involving significant rail traffic. Accordingly the carrier is not relieved of its obligations under the RLA.

We are unpersuaded by Burlington's insistence that the administrative processes of the ICC and, ultimately, the labor protective conditions accompanying an exemption, assure that labor's interests are respected and preserved and therefore render the RLA unnecessary. In exemption proceedings before the ICC, the unions are, at most, a "small voice of protest" and labor's concerns are only one of fifteen co-equal policies that the ICC must balance. The mandatory bargaining provisions of the RLA contemplate that labor and management will negotiate on an equal footing in disputes affecting the boundaries of labor's basic rights and duties in the employment relationship. Nowhere did Congress express an intent to force the unions to rely on their limited position at the ICC to uphold their collective bargaining agreements when a carrier seeks to alter the terms of the agreements by directing substantial business otherwise handled by union members to a non-union subsidiary.

688 F.Supp. at 1270–71 (footnote and citations omitted).

This court recognizes that this case has some distinguishing features from *BN v. UTU*, but we believe that the theme underlying that decision has application here. Unlike transactions subject to ICC approval under § 11343, Congress did not expressly provide that a § 10505 exemption relieves the involved railroads of any attendant statutory duties, such as their obligations under the RLA. Further, we recognize, as did the district court in *BN v. UTU*, that "[t]he potential harm to the basic policies of the RLA far outweigh any benefits to commerce that might accompany an exemption trackage rights agreement." 688 F.Supp. at 1270.

The court understands the significant tension between the ICA and the RLA. The statutes are designed to achieve similar ends, i.e., to protect and promote interstate rail transport, but their methods are considerably different. The RLA, in an effort to prevent strikes, imposes a regulatory structure on the parties, forcing them

to forgo any unilateral action pending exhaustion of a lengthy process. In contrast, the ICA, as currently administered by the ICC and in an effort to prevent failures and abandonments, removes regulatory burdens and favors an expeditious process. Despite the tensions created by the two statutes, we believe we have an obligation to read the statutes in harmony. The construction argued by the ICC and the railroads of the ICA would result in a repeal by implication of the RLA. Repeals by implication are not favored. *See Watt v. Alaska*, 451 U.S. 259, 266–67, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981). In addition, to the extent we were to find a direct conflict between the RLA and ICA, it is unclear that it is the ICA which should preempt the RLA. *See Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie Railroad Co., supra*, 845 F.2d at 441–444.

Moreover, we believe, as we suggested in our previous order, that the Supreme Court's decision in *PL & E* supports this view, rather than the position of the railroads. In *PL & E*, the Supreme Court considered whether a railroad's sale of its assets pursuant to an exemption from the requirements of 49 U.S.C. § 10901 preempted the RLA. The Supreme Court concluded that the RLA did not prevent the immediate consummation of the PL & E's contract to sell. Nevertheless, the Court explicitly indicated that its holding was based "on our construction of the RLA and not on the preemptive force of the ICA." 491 U.S. at 512, 109 S.Ct. at 2597, 105 L.Ed.2d at 435. The Supreme Court noted that the "RLA is reasonably subject to a construction that would, at least to a degree, harmonize the two statutes." *Id.* The Supreme Court further noted that the ICA and the RLA are "complementary regimes." *Id.* at n. 18. The Court had the opportunity to hold that the ICA displaced or superseded the RLA, but it declined to do so.

■ The railroads have also argued that, independent of § 11341(a), they have no obligation to comply with the RLA if such compliance would interfere with the opti-

mal benefits they could obtain through the trackage rights transaction. In support of this contention, the railroads rely primarily upon *Venner v. Michigan Central Railroad Co.*, 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926) and *Seaboard Air Line Railroad Co. v. Daniel*, 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580 (1948).

The court also does not find this argument of the railroads persuasive. In *Venner* and *Daniel*, the Supreme Court rejected attempts to enforce state laws which were inconsistent with the ICA. The holdings in these cases were based on the federal preemption of state law, although we recognize as noted by the railroads that the Supreme Court failed to expressly rely upon the Supremacy and Commerce Clauses in either case. These cases are irrelevant to a determination of whether the ICA overrides another federal law. Accordingly, the railroads' reliance upon *Venner*, *Daniel* and other decisions in which the ICA was held to preempt state law is unavailing.

■ Finally, the railroads and the ICC contend that this court should enjoin the union from any attempt to frustrate the implementation of the N & W Conditions. They argue that the NLGA does not prevent the issuance of an injunction in support of the ICC's power to resolve labor disputes arising out of implementing ICC approved trackage rights. We disagree. The NLGA does not prevent a court from enjoining the specific mandate of another labor statute, but the NLGA's ban on federal injunctions is not lifted because the conduct of the union is unlawful under a non-labor statute such as the ICA. *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 435 n. 3, 444, 107 S.Ct. 1841, 1845–46 n. 3, 1850, 95 L.Ed.2d 381 (1987). *Also see PL & E*, 491 U.S. at 513, 109 S.Ct. at 2598, 105 L.Ed. at 436.

In sum, after a more thorough examination of the law and the arguments on this issue, we must conclude that we did not err in our order of October 25. Accordingly, the railroads' motion to vacate, alter or

amend pursuant to Rule 59(e) shall be denied.

## MOTION TO STAY

In the alternative, the railroads seek a stay of the court's order of October 25. The railroads request that the injunction entered by the court be suspended pending appeal pursuant to Fed.R.Civ.P. 62(c).

 In ruling on a request for an injunction pending appeal, the court must engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction. *Populist Party v. Herschler*, 746 F.2d 656, 659 (10th Cir.1984). Thus, the railroads must demonstrate: (1) a likelihood of success on the merits; (2) the threat of irreparable harm; (3) no substantial harm to other interested parties; and (4) no harm to the public interest.

 The court finds, based on the findings of fact and conclusions of law in this order and the other orders in this case, that the railroads have not shown a substantial likelihood of success on the merits. In addition, the railroads have not demonstrated that they will be irreparably harmed by this court's orders while their appeal is pending, or that the balance of harm to the parties favors issuance of a stay pending appeal because they are currently implementing the trackage rights agreement. Finally, the issuance of an injunction would be contrary to the public interest since the commands of the RLA would be violated. Accordingly, the railroads' motion for stay pending appeal shall be denied.

## MOTION TO AMEND

The railroads seek amendment of the court's order of November 13. The railroads request that the court add supplemental findings of fact and conclusions of law in order to clarify the court's application of the legal standards governing issuance of a preliminary injunction. The union has objected to the railroads' motion, but has failed to provide any support for their objection.

The court is not certain that the request made by the railroads needs to be granted since, in our order of November 13, we provided detailed findings of fact and indicated that "the railroads have met the necessary requirements for the imposition of a preliminary injunction." However, in an abundance of caution, the court shall add the following supplemental discussion of the law.

 A party seeking a preliminary injunction must satisfy four prerequisites: (1) substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). The most important of the four prerequisites is plaintiff's demonstration of irreparable injury. Wright & Miller, *Federal Practice and Procedure: Civil* § 2948, p. 431 (1973). The second requirement for the issuance of a preliminary injunction—likelihood of success on the merits—is not as important in the Tenth Circuit as the demonstration of irreparable injury. In *Otero Savings & Loan Assoc. v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir.1981) (quoting *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964)), the Tenth Circuit indicated the following concerning this requirement:

> The Tenth Circuit has adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

 The court finds that the railroads have demonstrated a substantial likelihood of success on the merits. The revised trackage rights operation appears to present a minor dispute under the RLA. In addition, a strike by the BLE would

cause substantial irreparable injury to the railroads in terms of financial and competitive harm. Furthermore, the balance of hardships weighs in favor of the railroads. The BLE would not be harmed by the revised operation, and would in fact be benefitted to the extent that the operation creates new jobs for members of the BLE. Finally, the public interest would appear to be served by enjoining the threatened strike of the BLE. In sum, the railroads have no adequate remedy at law for the irreparable injury they would suffer from the unlawful strike that has been threatened by the union. The railroads have met all of the requirements for an injunction under the Norris–LaGuardia Act.

IT IS THEREFORE ORDERED that the railroads' motion to vacate, alter or amend the court's order of October 25, 1990 (Doc. # 52) be hereby denied.

IT IS FURTHER ORDERED that the railroads' motion for stay pending appeal (Doc. # 29) be hereby denied.

IT IS FURTHER ORDERED that the railroads' motion to amend the court's order of November 13, 1990 (Doc. # 54) be hereby granted as set forth in the foregoing memorandum.

IT IS SO ORDERED.